CARLSON v. COMERIC CO., Limited, et al.

(District Court, E. D. New York. August 2, 1905.)

SHIPPING—INJURY OF STEVEDORE'S EMPLOYÉ—LIABILITY OF SHIP.

Libelant's intestate was employed by a stevedore in loading a vessel, the lighter articles being transferred from lighters to the hold by means of booms and tackle furnished by the ship while extraordinarily heavy weights were moved with a derrick. During the absence of the foreman deceased had charge of the tackle, and, having taken from a lighter a draft of twice the weight the booms and tackle were calculated to safely carry, a hook broke, allowing the load to swing against deceased, causing an injury from which he died. Held, that it was the duty of the stevedore, and not of the ship, to see that the booms were properly used, and not overloaded, and that the ship was not liable for the injury, it not appearing that it resulted from any negligence of the owners in supplying and maintaining tackle.

In Admiralty. Action for death of stevedore.

Elmer S. White, for libelant.

Convers & Kirlin (J. Parker Kirlin, of counsel), for respondent.

THOMAS, District Judge. The steamship Comeric was lying at the foot of Forty-Fourth street, Brooklyn, on the south side of the

pier, where she was taking on cargo both from the dock and from lighters coming to her starboard side. No. 2 hatch is aft the foremast, which carried two booms. The port boom was plumb with the hatch, and was held in position by two guy ropes, one passing from each side of the vessel, and made fast to the boom by sister hooks. The end of the boom was about 25 feet above the opening of the hatch. The starboard boom was also held by guys, and extended over the starboard side of the vessel, so that its end cleared the ship's rail by about 5 feet, and was raised about 20 feet above the deck. Each boom carried separate tackle, the inner end of which ran to a separate winch between the foremast and the hatch. From the end of each boom was a fall. The two falls were shackled at their ends, and from the shackle depended a hook. At the time of the accident the process of loading was this: The hook last named was carried to the lighter, and attached to proper ropes around the draft. Then the starboard winch was set in motion, whereby the draft was raised to a suitable distance above the rail of the ship. Then the port winch was set in motion, so as to draw the cargo towards the hatch, the starboard winch meanwhile releasing. If the starboard winch released properly as the port winch began to draw in the draft, the burden would be gradually transferred from the starboard boom to the port boom, until the draft was substantially over the hatch, when the port boom would carry the whole burden, provided there was sufficient slack given to the starboard tackle. But during such transfer of burden a severe strain would be brought on the port guy of the port boom. This tackle had been used similarly for loading for 16 days before the accident about to be mentioned. The tackle had all been prepared by the ship, and the stevedore had no duty in its selection, erection, or maintenance, but it was his duty to use it in a proper way. On the day of the accident an attempt was made to raise a piece of machinery weighing about 9,100 pounds. Carlson, the libelant's husband, was a gangwayman. It was his duty to give orders to the winchman, and, after the draft had swung within the starboard rail, to go behind it, and, following as it swung inboard, give it position and direction in approaching the hatch, so that, having arrived over it, it could be lowered through the same to the hold below. The foreman of the stevedores was absent at the time of the accident. The assistant foreman was in the hold, whence he gave orders to Carlson as to the size of the package that could be conveniently received at the moment, and the latter transmitted this order to the person on the lighter, so that a package of desired size could be selected. When the draft in question came up, and had passed the rail, and Carlson had put himself behind it for the purpose stated, and when the draft had reached some point between the rail and the hatch, the sister hooks at the end of the guy of the port boom broke. This allowed the port boom to go quickly to starboard, carrying with it the draft, and, as Carlson was facing it, he was swept backward to the rail and so injured that he shortly died. He left a widow and a child about five or six years old, in whose behalf the libel is filed. This was undoubtedly the largest

draft lifted in the manner above stated, although prior to the accident many drafts weighing from 2½ to 3 tons had been hoisted by the same tackle. The day before the work began the foreman received from the ship's agent a list of the cargo, some portion of which, at least, showed heavy weights. The foreman states that the morning before the loading began he showed this list to the first mate, whose duty it was to prepare the tackle, and who did prepare it. While this statement is contested, those in charge of the ship knew that heavy bodies, consisting of locomotives with their fittings and electrical machinery, would be taken, and as the work advanced they did know the nature of the cargo. But when the draft weighed more than 2½ or 3 tons a single boom was used by the stevedore to lift it to the deck and swing it from the deck to the hatch, and, if the cargo was of extraordinary weight, derricks were employed.

The respondent claims that it was negligent to lift a draft of the weight of that in question, and that in preparing the tackle there was and should have been no apprehension that such heavy drafts would be attempted by the use of two booms in the manner described. The theoretical breaking strain of sound sister hooks of the size and quality of iron used is 14,500 pounds, which would require that the weight of the draft should be 26,400. But the permissible actual strain on the hook requires that the draft should be only one-sixth of the load that in theory would cause the breaking point to be reached. Hence the load lifted should not weigh more than one-sixth of 26,400 pounds, or 4,600 pounds. Mr. Ruggles, the libelant's expert, places the safety load at 4,200 or 4,300 pounds. In fact, the load that caused the hook to break weighed 9,100 pounds, which is about twice the weight that in theory and practice such a hook is expected to bear. The evidence shows preponderatingly, and, as it is thought, beyond doubt, that neither theory nor practice justified a draft of 9,100 pounds in the manner employed. The hoisting of the starboard boom and transfer to the port boom of such draft was a palpable abuse of the tackle, which the ship was not bound to expect, and against which it was not its duty to provide. It was its duty to provide tackle that would support loads with which men of usual skill and prudence in the business would burden it. The evidence shows plainly that such men, acting prudently, would not attempt to load a draft of 9,100 pounds. It had not been done previously in loading the Comeric, and should not have been undertaken. But the learned counsel for the libelant in the admirable presentation of his case urges that the libelant's decedent was a plain working man, untaught in the theoretical knowledge involved, and could not be expected to know of the safety limit, or even practically that a draft was too heavy; and that he could not determine the weights of the boxes sent up by the lighter, but that he was obliged to take whatever came, and do the duty assigned to him. If all this be admitted, it is necessary to draw the correct legal inference. The ship was bound to furnish tackle that would sustain loads expectable in the usual course of business. It

was the duty of the contracting stevedore to see to it that only such loads were hoisted, and to use proper judgment in the selection of such loads. The fact that the stevedore neglected to be on hand personally or by proper representative, and thereby exposed his servant to injury by the selection of an improper load, increased neither the duty nor the liability of the ship. It had no contractual or other relation to the servant. He was licensed to be on the ship only as the servant of the stevedore, and had no right to demand more from the ship than it owed his master. If the ship would not have been liable to the stevedore had he been injured, it would not be liable to the servant similarly injured. Equal protection was due the stevedore and his men, and the same care on the part of the ship was their common right. Hence, when the ship furnished tackle that would lift proper loads—tackle that would serve if properly used—it could not be liable for injury arising from the misuse of the tackle. Neither the stevedore nor his servants were permitted to double the permissible load and demand that the ship furnish tackle adequate therefor. If the load be doubled, the breaking strain of the hook must be increased accordingly; and, if the ship were obliged to increase the capacity of its tackle to conform to its wrongful use by the stevedore, the duty of the ship would variably increase, and be subject to vicissitudes that it could not foresee, and against which it could not forearm. Then the vigilance demandable from the ship could not be measured, and whether its own neglect or the careless overloading of the tackle caused a given latent defect to develop to the point of final breakage could never be ascertained. If the stevedore or his men in the course of their work before the accident overloaded the tackle, this might be carried to such an extent as to cause the latent defect in the hook to appear at the surface in the manner alleged by the libelant. Then how could it be ascertained by whose fault the accident happened? The object of having a breaking strain greatly in excess of the permissible strain is not to guard against the negligent use of the tackle, nor can a stevedore be heard to say that, although he doubled the lawful load, yet, if the ship had maintained the theoretical strength, the stevedore's negligence would have been ineffective. Where, then, was the servant's protection against injury from overloading? His own master owed him that duty. It was his master's duty, and not that of the ship, to see to it that the tackle was not overloaded. The ship did not undertake to prevent overloading. The stevedore did. Hence, lest an unduly heavy hoist be attempted, it was his duty to be on hand and supervise the work. It is urged by the claimant that the decedent was vested with the duty of his master, and that he became the foreman in the absence of the master or the regular foreman. If so, the duty that rested solely on the stevedore was delegated to him, and, if he undertook its performance, he assumed the duty and risk of its fulfillment. But the question does not require answer, for, even if he did not stand in the place of a foreman, the duty of the ship was not thereby increased. A skilled man was required to be present to decide what was the approximate weight of a box proposed to be hoisted, and how it

should be taken aboard. It was the duty of the stevedore to furnish such a man. When the accident happened, there was no proper person to perform this office. Hence the accident.

The foregoing views make it unnecessary to examine the question whether the flaw in the hook extended to the surface, so as to be discoverable in the exercise of ordinary care. There is no satisfactory evidence that the hook would have been broken under a proper load, and the ship was not obligated to discover defects to avoid the results of an improper load. The ship cannot be held negligent, unless it also be held that it was bound to exercise care to prevent injury from abuse of its tackle by the stevedore. That doctrine is not approved.

The libel will be dismissed.